## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PLASTIC OMNIUM ADVANCED INNOVATION AND RESEARCH, | ) ) ) | |
| Plaintiff-Counterclaim Defendant, | ) ) | C.A. No. 16-187-LPS-CJB |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| DONGHEE AMERICA, INC. and DONGHEE ALABAMA, LLC, | ) ) ) | **PUBLIC VERSION** |
| Defendants-Counterclaimant. | ) | |

## DEFENDANTS DONGHEE AMERICA, INC. AND DONGHEE ALABAMA, LLC'S OPENING CLAIM CONSTRUCTION BRIEF

OF COUNSEL:

Alyssa Caridis
ORRICK, HERRINGTON &
SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017-5855
(213) 629-2020

Nicholas H. Lam
ORRICK, HERRINGTON &
SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
(212) 506-5000

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Defendants*
*Donghee America, Inc. and*
*Donghee Alabama, LLC*

Dated:  April 26, 2017
Public Version dated:  May 3, 2017
5111295

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    CLAIM CONSTRUCTION PRINCIPLES .................................................... 2

III.   ARGUMENT ........................................................................................................ 3

       A.    Parison Terms ...................................................................................... 3

             1.    "Extruded parison of closed cross section" ('921 Patent) and
                   "Extruding a [multilayer] parison" ('812 Patent) ..................... 4

             2.    "Split or at least two-part parison" ('327 Patent)...................... 6

             3.    "Extruded tubular parison" ('604 and '228 Patents)................. 7

       B.    During /At the Same Time/While Terms ............................................. 8

             1.    During/At the Same Time ('921 Patent, '490 Patent, '327 Patent) ........... 9

             2.    "Inserting a core into the parison during blow molding" ('604
                   Patent) ........................................................................................ 12

       C.    "Preassembled structure" ('812 and '253 Patents) ............................ 13

       D.    "Orifice" ('326 Patent)....................................................................... 16

       E.    Shaping Terms ('326 and '327 Patents).............................................. 17

       F.    "Stretched" ('228 Patent).................................................................... 19

IV.    CONCLUSION.................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*,
    359 F.3d 1367 (Fed. Cir. 2004) ...................................................................................... 14

*Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*,
    616 F.3d 1249 (Fed. Cir. 2010) ...................................................................................... 14

*Comark Commc'ns, Inc. v. Harris Corp.*,
    156 F.3d 1182 (Fed. Cir. 1998) ...................................................................................... 11

*Felix v. American Honda Motor Co.*,
    562 F.3d 1167 (Fed. Cir. 2009) ...................................................................................... 14

*Halliburton Energy Servs., Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008) ................................................................................. 11, 12

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
    452 F.3d 1312 (Fed. Cir. 2006) ...................................................................................... 4, 5

*InterDigital Commc'ns, LLC v. ITC*,
    690 F.3d 1318 (Fed. Cir. 2012) ...................................................................................... 11

*Kumar v. Ovonic Battery Co.*,
    351 F.3d 1364 (Fed. Cir. 2003) ...................................................................................... 7, 8

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014) ....................................................................................... 2, 3, 11, 18

*Netword, LLC v. Centraal Corp.*,
    242 F.3d 1347 (Fed. Cir. 2001) ........................................................................................ 2

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ................................................................... 2, 5

*Primos, Inc. v. Hunter's Specialties*, *Inc.*,
    451 F.3d 841 (Fed. Cir. 2006) ........................................................................................ 14

*Systems Division, Inc. v. Teknek LLC*,
    59 F. App'x 333 (Fed. Cir. 2003) ................................................................................... 7, 8

*Tech. Innovations, LLC v. Amazon.com, Inc.*,
    35 F. Supp. 3d 613 (D. Del. 2014) .................................................................................. 18

*Trustees of Columbia Univ. in City of N.Y. v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016).............................................................................................18

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007)...............................................................................................5

## TABLE OF EXHIBITS

The following extrinsic evidence is attached hereto:

| Ex. No. | Description |
|---|---|
| 1 | Concise Encyclopedia of Plastics (2000) (excerpts) |
| 2 | Tool and Manufacturing Engineers Handbook (1996) (excerpts) |
| 3 | McGraw-Hill Dictionary of Scientific and Technical Terms (1994) (excerpts) |
| 4 | Blow Molding Design Guide (1998) (excerpts) |
| 5 | Hollow Plastic Parts (2004) (excerpts) |
| 6 | Plastics Engineering Handbook of the Society of the Plastics Industry (1991) (excerpts) |
| 7 | Merriam Webster's Collegiate Dictionary (1995) (excerpts) |
| 8 | Webster's II New College Dictionary (2001) (excerpts) |
| 9 | Random House Webster's Unabridged Dictionary (1998) (excerpts) |
| 10 | Plastic Omnium's Initial Infringement Contentions (excerpts) (filed under seal) |

The Asserted Patents and other intrinsic evidence cited herein are attached to the parties'

Revised Joint Claim Construction Chart filed on April 26, 2017 (D.I. 83):

| Ex. No. | Description |
|---|---|
| B | U.S. Patent No. 6,814,921 |
| C | U.S. Patent No. 6,866,812 |
| D | U.S. Patent No. 7,166,253 |
| E | U.S. Patent No. 8,122,604 |
| F | U.S. Patent No. 8,163,228 |
| G | U.S. Patent No. 9,079,490 |
| H | U.S. Patent No. 9,399,326 |
| I | U.S. Patent No. 9,399,327 |
| J3 | '326 Patent Prosecution History (excerpts) |
| J4 | '327 Patent Prosecution History (excerpts) |

I.  **INTRODUCTION**

This is a patent infringement lawsuit between competitors in the field of manufacturing automotive fuel tanks.  Plaintiff Plastic Omnium Advanced Innovation and Research ("POAIR" or "Plastic Omnium") brought suit against Defendants Donghee America, Inc. and Donghee Alabama, LLC (collectively, "Donghee") centered on Donghee's manufacture of fuel tanks for Hyundai Motor Company in Auburn, Alabama.  Donghee, along with its parent corporations, are stalwarts in the automotive fuel tank industry and have established a deep business relationship with Hyundai, spanning over twenty years.  Approximately four years after Donghee was awarded a contract from Hyundai to produce certain automotive fuel tanks—and two years into the manufacturing run in Auburn—Plastic Omnium brought the present suit.

In this action, Plastic Omnium accuses Donghee of infringing eight patents[1] claiming various purported inventions related to fuel tank manufacturing.  As described in Donghee's concurrently-submitted technical tutorial, the Asserted Patents can be grouped into three categories: (1) inserting fuel system components into tanks during manufacturing, (2) the mechanism for physically attaching those components, and (3) mitigating stresses introduced by attaching components.  In the first category are the '921, '812, and '253 Patents.  The '921 and '812 Patents claim a process of forming a fuel tank by extruding a parison, cutting the parison to form one or more plastic sheets, inserting components between the sheets, and molding the sheets to form the fuel tank.  The '253 Patent claims using a preassembled structure to support components inserted into the tank.  In the next category, the '490, '326, and '327 Patents claim a

---

[1] U.S. Patent Nos. 6,814,921 ("'921 Patent"); 6,866,812 ("'812 Patent"); 7,166,253 ("'253 Patent"); 8,122,604 ("'604 Patent"); 8,163,228 ("'228 Patent"); 9,079,490 ("'490 Patent"); 9,399,326 ("'326 Patent"); and 9,399,327 ("'327 Patent") (collectively, "Asserted Patents"). Copies of the Asserted Patents are attached as Exhibits B through I to the Revised Joint Claim Construction Chart filed on April 26, 2017 (D.I. 83).

process for riveting components to a fuel tank.  In the final category, the '604 and '228 Patents relate to using flexible accessories and pre-stretched pipes to mitigate stress introduced when attaching components to the fuel tank.

Pursuant to the Court's Order (D.I. 75), the parties limited the number of claim terms in dispute during this round of claim construction briefing to ten.  Plastic Omnium is asserting all eight patents and 48 claims against Donghee.  Without a significant reduction in asserted claims, Donghee anticipates the need to construe additional claim terms before trial.

## II.    <u>CLAIM CONSTRUCTION PRINCIPLES</u>

Claim terms should be construed consistently with their meaning to one skilled in the art at the time of the application.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*).  Because the claims "are part of a fully integrated written instrument, [they] must be read in view of the specification, of which they are a part."  *Id.* at 1315 (quotation marks omitted).  "Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term."  *Id.*  Though the specification need not disclose all embodiments of an invention, the claims cannot "enlarge what is patented beyond what the inventor has described as the invention."  *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001).

A court may also "rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'"  *Phillips*, 415 F.3d at 1317.   Within the class of extrinsic evidence, the Federal Circuit has "especially noted the help that technical dictionaries may provide to a court 'to better understand the underlying technology' and the way in which one of skill in the art might use the claim terms."  *Id.* at 1318.

A claim "must be precise enough to afford clear notice of what is claimed, thereby 'appris[ing] the public of what is still open to them.'"  *Nautilus, Inc. v. Biosig Instruments, Inc.*,

134 S. Ct. 2120, 2129 (2014).  "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Id.* at 2124.

## III.   ARGUMENT

### A.   Parison Terms

Most of the asserted claims require the formation of a "parison" during the manufacturing processes.  "Parison" is a well understood term in the art of plastics manufacturing technology.[2] Generally speaking, it is the extruded plastic tube that serves as the starting point in the blow molding process.  Several of the asserted patents contain definitional language describing the claimed parison in this manner.[3]  These definitions are consistent with numerous dictionaries and technical treatises.  Donghee's proposed constructions reflect this well understood meaning.

Parisons are formed as plastic emerges from an extruder head.  An extruder head is a piece of machinery that shapes molten plastic into a desired shape.  The last step of the extrusion process is forcing the material through a die at the bottom of the extruder head to shape the plastic into a form suitable for blow molding.  The parties' disputes about the parison terms center on whether an extruded parison is the plastic tube that leaves the die at the end of the extruder head, as Donghee contends, or whether the terms should be construed broadly enough to capture the flow of molten plastic inside of the extruder head, as Plastic Omnium contends.  The

---

[2] Donghee generally contends that a person of ordinary skill in the art would be someone with a Bachelor's of Science in polymer engineering or mechanical engineering, with two to three years of relevant work experience in molding and/or plastics product design.

[3] Most asserted claims include some variant of the term "parison."  However, there are six unique specifications across the asserted patents, and many of these specifications describe a "parison" in slightly different wording.  As a result, the parties' constructions vary slightly across the patents.

accused process does not extrude a parison as required by the claims; it extrudes two separate, flat, sheets of plastic.  Because these extruded plastic sheets do not satisfy the parison limitations, Plastic Omnium attempts to read the parison limitations of its claims onto the molten plastic flowing *inside* the cylindrical metal structure of the extruder head.  But, a person of ordinary skill in the art, reading the asserted patents, would understand that a parison does not exist until the plastic tube is formed by forcing the plastic through the die.

1.    **"Extruded parison of closed cross section" ('921 Patent) and "Extruding a [multilayer] parison" ('812 Patent)**

| Term | POAIR Construction | Donghee Construction |
|---|---|---|
| **1.** "extruded parison of closed cross section" ('921 Patent, claim 1) | **1.** "an extruded plastic body having a closed cross section" | **1.** "a plastic tube with a closed cross section formed by forcing plastic through a die" |
| **2.** "extruding a [multilayered] parison" ('812 Patent, claims 16 and 32) | **2.** "extruding a [multilayered] plastic body having a closed cross section" | **2.** "forcing plastic through a die head to form a plastic tube [of multiple layers] with a closed cross section" |

The specification of the '812 Patent describes an "extruded parison" as "the product *obtained by passing, through a die*, a composition of at least one thermoplastic melt homogenized in an extruder whose head is terminated by the die."  '812 Patent at 2:35-38 (emphasis added).  Further, "according to the invention [of the '812 Patent], at least one cut is made in the parison *leaving the die* mounted on the extrusion head."  *Id.* at 2:46-47 (emphasis added); *see also id.* at 5:23-30.  Similarly, "according to the invention" of the '921 Patent, a plastic sheet "is advantageously obtained by cutting and opening a parison of closed cross section *leaving the die* mounted on the extrusion head.  '921 Patent at 3:24-27 (emphasis added); *see also id.* at 5:24-27.  Based on this definitional language, Donghee's proposed construction makes it clear that an "extruded" parison is formed by forcing plastic through a die.  *See Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (when a patentee

consistently describes an embodiment as "the invention," "[t]he public is entitled to take the patentee at his word"); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention.").

Plastic Omnium, on the other hand, does not clarify the meaning of "extruded" because it wants to argue later that its construction covers molten plastic present inside the machinery. Nowhere in the patents is an extruded parison described as the molten plastic inside of the machine. The Court should prevent such mischief by adopting Donghee's construction.

The patents' definition of a parison is consistent with how that term was used by those of ordinary skill in the art at the time of the invention, as evidenced by contemporaneous technical dictionaries. *See Phillips*, 415 F.3d at 1322 ("A dictionary definition has the value of being an unbiased source 'accessible to the public in advance of litigation,'" and judges may "rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained" by the intrinsic evidence). The following technical references explain that the meaning of extruded parison is a plastic tube formed by forcing molten plastic through a die:

- Concise Encyclopedia of Plastics (2000) defines parison as: "The hollow tube of melt exiting the extruder die, which in turn is pinched at both ends and inflated with air to the contour of the closed mold cavity." Ex. 1 at 119.

- Tool and Manufacturing Engineers Handbook (1996) defines parison as: "In blow molding, the hollow tube of plastic melt extruded from the die head, and expanded within the mold cavity by air pressure to produce the molded part." Ex. 2 at Appx. B-7. The engineering book further defines extrusion as: "The process of forming continuous shapes by forcing a molten plastic material through a die." *Id.* at Appx. B-4.

- McGraw-Hill Dictionary of Scientific and Technical Terms (1994) defines parison as: "A hollow plastic tube from which a bottle or other hollow object is blow-molded." Ex. 3 at 1449. The dictionary also defines extrusion as: "A process in which a hot or cold semisoft solid material, such as a metal or plastic, is forced through the orifice of a die to produce a continuously formed piece in the shape of the desired product." *Id.* at 725.

- Blow Molding Design Guide (1998) states that the plastic "tube, widely known as the parison" is formed "through a head and die" in extrusion blow molding. Ex. 4 at 1.

- Hollow Plastic Parts (2004) states that the "molten tube of plastic, called a parison" is made when molten plastic is "pumped as a liquid… through a shaping die." Ex. 5 at 13.

- Plastics Engineering Handbook of the Society of the Plastics Industry (1991) states that "plastic melt is forced through the die to make the parison(s)," which typically has a "concentric tubular shape." Ex. 6 at 343, 347, 350.

General purpose dictionaries also define the term extrude as "to shape (as metal or plastic) by forcing through a die." Ex. 7, Merriam Webster's Collegiate Dictionary (1999) ("Webster's Collegiate"); *see also* Ex. 8, Webster's II New College Dictionary (2001) ("Webster's II"); Ex. 9, Random House Webster's Unabridged Dictionary (1998) ("Webster's Unabridged").

The specification supports Donghee's construction of the parison terms. This meaning is confirmed by a large number of dictionaries and technical treatises. Plastic Omnium's attempts to impermissibly broaden the ordinary meaning of the terms should be rejected.

### 2. "Split or at least two-part parison" ('327 Patent)

| Term | POAIR Construction | Donghee Construction |
|---|---|---|
| "split or at least two part parison" ('327 Patent, claims 1 and 15) | Plain and ordinary meaning, otherwise: "a plastic body for blow-molding that is split or made into two parts" | "a plastic tube with a closed cross section formed by forcing plastic through a die, which is then cut" |

While using slightly different words, the claims of the '327 Patent also involve the formation and use of a parison. According to the patent's specification, the invention is based on "the fact that a parison is melted during its moulding, and that it can be opened up (i.e. split or made up of two independent parts that can be parted from one another) so that an accessory can be stake-fastened in it." '327 Patent at 1:64-2:1. Beyond this, the specification itself does not provide further context about a "parison" or a "split or at least two-part parison."

However, the '327 Patent expressly incorporates, by reference, the European counterpart of the '812 Patent (Patent Application EP 1110697) and the PCT parent of the '921 Patent (WO

01/60592) in explaining how to make a split or at least two-part parison. *Id.* at 4:42-54; *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003) ("Our cases also establish that prior art cited in a patent… constitutes intrinsic evidence."); *Systems Division, Inc. v. Teknek LLC*, 59 F. App'x 333, 340 (Fed. Cir. 2003) ("That [prior] patent was incorporated by reference in its entirety into the [patents-in-suit], thus rendering [it] intrinsic evidence").  In "the invention" of both the '812 and '921 Patents, the parison is split or made into multiple pieces by making "at least one cut… in the parison leaving the die…."  '812 Patent at 2:46-48; '921 Patent at 3:24-27 (similar); *see also* '812 Patent at 5:28-30 (the parison is cut using "two steel blades [ ] placed… at the exit of the circular die"); '921 Patent at 5:24-27 (similar).  As explained above, the '812 and '921 Patents use the term "parison" consistent with its ordinary meaning in the art:  "a plastic tube of closed cross section formed by forcing plastic through a die."

Accordingly, the intrinsic evidence of the '327 Patent, including the '812 and '921 specifications which are expressly incorporated by reference, and the extrinsic evidence of the ordinary meaning of parison, compel a finding that a person of ordinary skill in the art would understand a "split or at least two-part parison" to mean "a plastic tube of closed cross section formed by forcing plastic through a die, which is then cut."

### 3.  "Extruded tubular parison" ('604 and '228 Patents)

| Term | POAIR Construction | Donghee Construction |
|------|--------------------|-----------------------|
| "extruded tubular parison" ('604 Patent, claim 8; '228 Patent, claim 2) | "extruded tubular preform intended to form the wall of the fuel tank after molding" | "tubular preform intended to form the wall of the fuel tank after molding, formed by forcing plastic through a die" |

Certain claims of the '604 and '228 Patents require an "extruded tubular parison."  '604 Patent at claim 8; '228 Patent at claim 2.  The specifications of those patents describe a *parison* as a "preform, generally extruded, which is intended to form the wall of the tank after being moulded to the required shape and dimensions."  '604 Patent at 4:64-67; '228 Patent at 2:34-36

7

(similar).  Rather than give meaning to the entire claim phrase, Plastic Omnium again avoids construing the term "extruded" in an attempt to keep the claim vague enough to argue later that its construction covers molten plastic inside the extruder.

The only reference to an *extruded tubular parison* in the '604 and '228 Patents is when the patents describe and expressly incorporate the European counterpart to the '812 Patent (Application EP 1 110 697).  '604 Patent at 5:4-10; '228 Patent at 2:38-46; *Kumar*, 351 F.3d at 1368; *Systems Division, Inc.*, 59 F. App'x at 340.  As previously explained, the '812 Patent specification expressly defines the extruded parison as the plastic tube formed when plastic is forced through the die.  *See* Section III.A.1, *supra*.  This definition is fully consistent with the extrinsic evidence.  *See id.*  A person of ordinary skill in the art would thus understand an "extruded tubular parison" in the '604 and '228 Patents to be the "extruded parison" in the '812 Patent (which is tubular), and should thus be construed consistently.

Accordingly, the term "extruded tubular parison" should be construed as "tubular preform intended to form the wall of the fuel tank after molding, formed by forcing plastic through a die."  This construction takes into consideration the statement in the '604 and '228 Patents that a parison is a preform intended to form the wall of the fuel tank after molding ('604 Patent at 4:64-67; '228 Patent at 2:34-36), and the ordinary meaning of extruded parison used in the incorporated '812 Patent, which is a plastic tube formed by forcing plastic through a die.

**B.     During /At the Same Time/While Terms**

One of the purportedly key characteristics of several of the asserted patents is the ability to attach components to the fuel tank during molding.  The patents describe that "shells" are formed by molding plastic into a desired shape.  *See, e.g.*, '921 Patent at 2:43-54.  The "shells" are defined as "a non-closed partial envelope in the form of an open hollow body, with a surface shape having at least one concave portion," and two shells can be joined to form a tank.  *See,*

*e.g.*, *id.* at 2:30-35.  Internal accessories can either be incorporated "*at the same time*" as the molding of the shells or "*after the shells have been molded*…."  *See, e.g.*, *id.* at 4:1-22 (emphasis added).  The verb "molding" (or "moulding") has a well understood meaning—it refers to the act of shaping material.  *See* Ex. 8, Webster's II ("To form into a particular shape"); Ex. 7, Webster's Collegiate ("to give shape to"); Ex. 9, Webster's Unabridged ("to shape or form in or on a mold").  The requirement to perform an action "at the same time as," "while," or "during" molding therefore necessarily requires performing that action while the material is being shaped.

The parties' dispute here is one of timing and ambiguity.  Donghee seeks constructions making clear that the claimed attachment steps must take place at the same time that the shells are being shaped.  Plastic Omnium, on the other hand, seeks to impermissibly broaden the claims to encompass an amorphous and ill-defined "process," with no clarity as to when the process begins or ends.  This will not aid the jury in understanding the meaning of the phrase.  Rather, Plastic Omnium proposes its construction because, in the accused process, the accessories are attached during a separate manufacturing step, after the shells have already been shaped.  Donghee's proposed constructions hew to the claim language and the inventors' description of the alleged invention in the specification and prosecution history and will prevent Plastic Omnium from expanding the claims well beyond what the inventors claimed as their invention.

### 1.  During/At the Same Time ('921 Patent, '490 Patent, '327 Patent)[4]

| Term | POAIR Construction | Donghee Construction |
|---|---|---|
| **1.** "during the operation of molding the shell" and "during molding" ('921 Patent, claims 5, 8, 9) | Plain and ordinary meaning, otherwise:<br>    **1.** "during the processing of forming the tank shell and before joining the shells" | **1.** "while the sheet is being compression and/or blow molded to form the shell" |

[4] These three patents each claim that certain procedures must be performed either "during" or "at the same time as" molding.  For simplicity and due to the similarity of the terms, the parties agreed to brief these terms together.

| Term | POAIR Construction | Donghee Construction |
|---|---|---|
| **2.** "at the same time as said tank is manufactured by moulding with a mould" ('490 Patent, claims 1 and 12) | **2.** "during the blow molding process" | **2.** "while the plastic is being thermoformed or blow molded to form the tank" |
| **3.** "at the time of manufacture of the tank when moulding" ('327 Patent, claims 1 and 9) | **3.** "during the blow molding process" | **3.** "while the plastic is being thermoformed or blow molded to form the tank" |

The intrinsic evidence makes clear that when the patents discuss actions taken "during" or "at the same time as" molding, they are referring to the time period when the plastic is being shaped by either blow molding or thermoforming.  For example, the '490 Patent explains that molding, "by definition" involves "the use of a mould comprising in general two cavities that are intended to be in contact with the external surface of the parison, the thermoforming or blow-moulding of the parison taking place by the parison being pressed against these cavities."  '490 Patent at 5:25-30.  This concept is echoed elsewhere in the specification where, for instance, the patent describes that "[t]he moulding of fuel tanks generally starts with a parison… which is intended to form the wall of the tank *after being moulded to the required shape and dimensions*."  '490 Patent at 4:63-66 (emphasis added).  This description of molding as the forming of the plastic into a particular shape is repeated throughout the patent specifications.  *See, e.g.*, '921 Patent at 2:43-47 ("According to the invention, the molding of at least one shell comprises the compression-molding of a portion of the sheet and the blow-molding of the portion not compression-molded."); '327 Patent at 4:40-54.

The language of the claims themselves also require that molding refers to the step of shaping, or forming, the shells.  The "during" terms in the '921 Patent are found in dependent claims 5, 8, and 9.  Claims 5 and 8 depend from claim 4.  In claim 4, accessories are inserted into the shell "before joining" the two shells into a tank.  By contrast, claims 5 and 8 further limit

10

when the accessories are inserted by stating that such insertion takes place "during the operation of molding the shell."  Under the doctrine of claim differentiation, "during the operation of molding" must be presumed to mean something different (and more narrow) than simply the time before the shells are joined.  *See Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (claim differentiation creates "a presumption that each claim in a patent has a different scope"); *InterDigital Commc'ns, LLC v. ITC*, 690 F.3d 1318, 1324 (Fed. Cir. 2012) ("claim differentiation is at its strongest in this type of case, 'where the limitation that is sought to be 'read' into an independent claim already appears in a dependent claim'").

Further support is found in the prosecution history.  During the prosecution of the '327 Patent, the applicant distinguished the claimed invention over the prior art by emphasizing that "the accessory is inserted and fastened to the sheets *during the moulding process*…."  Revised Joint Claim Construction Chart (D.I. 83), Ex. J4 at PO_00001916 (emphasis added).  In contrast, the prior art "first moulds [the tank] then fastens [the accessories]."  *Id.*

Contemporary dictionary definitions further confirm that a person of ordinary skill in the art would understand molding is the process of imparting shape on to plastic.  *See* Ex. 8, Webster's II ("To form into a particular shape"); Ex. 7, Webster's Collegiate ("to give shape to"); Ex. 9, Webster's Unabridged ("to shape or form in or on a mold").

Contrary to this well-understood meaning, Plastic Omnium refuses to recognize that "during molding" means the time during which the plastic is actually being shaped.  Plastic Omnium's construction creates an ambiguity regarding the bounds of the "blow moulding process."  It is unclear when that process starts and stops.  Such a construction is improper.  *See Nautilus*, 134 S. Ct. at 2123 ("a patent must be precise enough to afford clear notice of what is claimed, 'thereby apprising the public of what is still open to them'"); *Halliburton Energy*

*Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1254 (Fed. Cir. 2008) ("resolv[ing] the ambiguity in a way that gives it the broadest possible construction… would undermine the notice function of the claims because it would allow Halliburton to benefit from the ambiguity, rather than requiring Halliburton to give proper notice of the scope of the claims to competitors").  Moreover, to the extent it ensnares actions taken *after* the shell is formed, it is inconsistent with the intrinsic and extrinsic evidence.  Once the plastic has taken the shape of the mold, the time limitation defined by "during molding" expires.  Donghee's constructions should be adopted.

### 2.       "Inserting a core into the parison during blow molding" ('604 Patent)

| Term | POAIR Construction | Donghee Construction |
|------|--------------------|----------------------|
| "inserting a core into the parison during the blow-molding"<br>('604 Patent, claim 1) | Plain and ordinary meaning, otherwise:<br>"inserting a core into the parison during the blow-molding process" | "inserting a core into the parison, then injecting pressurized gas to form the fuel tank" |

As with the three patents discussed above, the timing of accessory attachment is crucial in the '604 Patent.  That patent requires placement of a core inside the parison to attach accessories "during the actual manufacture of the tank *by moulding*." '604 Patent at Abstract (emphasis added).  The specification and claims confirm that attachment occurs during actual molding: "this invention relates to a method for fastening an accessory … this fastening taking place during the actual manufacture of said tank by moulding." *Id.* at 2:13-16; *see also id.* at claim 1 ("fastening an accessory … on a wall of the plastic fuel tank during the actual manufacture of the fuel tank by moulding").

As Donghee has already shown, "molding" refers to the process of forming or imparting shape on the plastic.  This concept is also encompassed in the '604 Patent, which states "blow-moulding of the parison tak[es] place by the parison being pressed against the impressions … by using a pressurized gas injected into the parison." *Id*. at 5:28-32 (removing unrelated references

to vacuum pressure and thermoforming, as only blow-molding is claimed).

Moreover, Donghee's construction gives meaning to the entire phrase "during blow molding" by clarifying that blow-molding, as described in the specification, means "injecting pressurized gas to form the fuel tank." *Id*. at 5:31-32.  Plastic Omnium, on the other hand, again attempts to impermissibly broaden the phrase to encompass some nebulous "process." Donghee's construction will aid the jury in understanding the meaning of the claim language and should be adopted.

### C.    "Preassembled structure" ('812 and '253 Patents)

| Term | POAIR Construction | Donghee Construction |
|---|---|---|
| "preassembled structure" ('253 Patent, claims 1, 14; '812 Patent, claim 41) | Plain and ordinary meaning, otherwise:<br>"a premade structure" | "a set of multiple parts previously joined into a single arrangement that attaches to at least several accessories" |

The '253 and '812 Patents belong to the same patent family and share a common specification.  The patents claim inventions related to the use of a preassembled structure to support accessories incorporated into a fuel tank.  There are at least three disputed issues regarding "preassembled structure."

The first issue is whether or not the preassembled structure is distinct from the accessories that it supports.  Donghee believes that a preassembled structure and an accessory are different things, while Plastic Omnium contends that the preassembled structure and the accessory can be one and the same thing. *See* Ex. 10, Initial Infringement Contentions at pp. 2-3, 4-5 (identifying a one-piece baffle and one-piece pillar as each being both an accessory and a preassembled structure).

The plain language of the claims distinguishes the preassembled structure from the accessories.  For example, claim 1 of the '253 Patent recites that the "accessory… is supported

by a preassembled structure."  By separately reciting both an "accessory" and a "preassembled

structure," the claim indicates that they are different things.  *See Primos, Inc. v. Hunter's*

*Specialties, Inc.*, 451 F.3d 841, 848 (Fed. Cir. 2006) ("the terms 'engaging' and 'sealing' are

both expressly recited in the claim and therefore 'engaging' cannot mean the same thing as

'sealing'; if it did, one of the terms would be superfluous"); *Bancorp Servs., L.L.C. v. Hartford*

*Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004).  Moreover, the requirement that one thing

(the preassembled structure) "supports" the other (the accessory) requires that they are separate

structural elements.  *See Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249,

1255 (Fed. Cir. 2010) (because claims required a spring means to be "connected to" a hinged

arm, patentee's assertion that "the spring means and the hinged arm can be the same structure

renders the asserted claims nonsensical").  Construing the accessory and the preassembled

structure as a single structure would render the "supported by" requirement nonsensical and

meaningless.  *See id.; see also Felix v. American Honda Motor Co.*, 562 F.3d 1167, 1178 (Fed.

Cir. 2009).  To wit, this language necessitates that the accessory is something different than a

preassembled structure.

Furthermore, the common specification confirms that the preassembled structure is

something that "attaches" to an accessory, and is not itself the accessory.  Accessories are "any

object or device which is generally associated with the hollow body in its usual method of use or

operation and which interacts with it in order to fulfil certain useful functions" such as "liquid

pumps, pipettes, reservoirs or baffles internal to the hollow body, and ventilation devices."  '253

Patent at 4:5-11.  Preassembled structures are separate structures which support accessories.  *See*

*id.* at 4:12-14 ("Preferably, the inserted accessory… is supported by a preassembled structure."),

4:23-26 ("It is also possible, independently of the above insertion of accessories, to insert,

between the sheets, a preassembled structure which comprises at least one device for anchoring this structure to the internal wall of the hollow body."). The only function the preassembled structure fulfills is to aid in the insertion and attachment of accessories. *See id.* at 4:12-49.

The second disputed issue is whether a preassembled structure is a structure previously assembled from multiple parts, as Donghee contends, or simply a structure that is premade, even if that structure is only a single part, as Plastic Omnium contends. *See* Ex. 10, Initial Infringement Contentions at pp. 3-5 (identifying a mounting bracket, baffle, and pillar, each of which are molded as unitary pieces of plastic). The patents do not describe how to preassemble a structure and thus necessarily rely on what a person of ordinary skill in the art would understand preassembling to mean. The ordinary meaning of "preassembled" is crystal clear in the extrinsic evidence. The prefix pre- means "earlier," before," "prior to," "in advance," "beforehand." Ex. 8, Webster's II; Ex. 7, Webster's Collegiate; Ex. 9, Webster's Unabridged. The word "assembled" means "to fit or join together the parts of." Ex. 8, Webster's II; *see also* Ex. 7, Webster's Collegiate ("to fit together the parts of"); Ex. 9, Webster's Unabridged ("to put or fit together; put together the parts of"). Thus, a preassembled structure is an assembly of "multiple parts previously joined into a single arrangement."

The third disputed issue is whether the preassembled structure must be capable of supporting one accessory or more than one accessory. According to the patents, the preassembled structure invention has "the advantage of being able to produce the preassembled structure, *supporting all or at the very least several accessories* to be introduced into the hollow body, in a separate process prior to their introduction into the hollow body." '253 Patent at 4:15-18 (emphasis added). Further, the invention can reduce the number of separate items to be inserted into the fuel tank. *Id.* at 4:45-47. Neither of these benefits are achieved if the

preassembled structure is capable of supporting only one accessory. The preassembled structure must attach to "at least several accessories" for the invention to make sense.

Accordingly, a person of ordinary skill in the art would understand "preassembled structure" in the '253 and '812 Patents to mean "a set of multiple parts previously joined into a single arrangement that attaches to at least several accessories."

### D. "Orifice" ('326 Patent)

| Term | POAIR Construction | Donghee Construction |
|------|--------------------|----------------------|
| "orifice" ('326 Patent, claim 1, 25, 27, 33, and 34) | Plain and ordinary meaning, otherwise: "hole" | "a hole that passes through the accessory [or support for an accessory]" |

The '326 Patent is directed to a method for attaching an accessory (or a support for an accessory) onto the wall of a plastic fuel tank. *See* '326 Patent at 2:15-32. While the plastic wall of the fuel tank is still hot and soft, part of the wall is "forced through [an] orifice of the accessory" that is to be attached to the wall. *Id.* at 2:21-23. The plastic is forced all the way through the orifice so that it protrudes on the other side. *Id.* at 3:35-40. The protruding plastic is then shaped into a plastic rivet that overhangs the orifice and keeps the accessory in place. *Id.*; *see also id.* at 6:22-30. Figure 1 of the patent below illustrates the forming of a rivet:



A mold insert with a spike (6) forces the plastic of the fuel tank wall (2, 2') through orifice (5) of the accessory (4). *Id.* at 6:17-24. The plastic fills the orifice and protrudes on the other side, and is then shaped by a counterform (7) into a rivet "which overhangs the orifice (5) and prevents the

accessory (4) from being removed….."  '326 Patent at 6:25-30.

The claimed method can only be accomplished if the orifice extends completely through the accessory.  A hole that does not pass all the way through the accessory (imagine a hole dug in the ground) would not allow the plastic to protrude through to the other side to form a "rivet" or "overhang" as required by the asserted claims.  "The invention therefore relates to a method for stake-fastening an accessory in a plastic fuel tank whereby [ ] the accessory is equipped with at least one *orifice which passes right through the accessory*…."  '326 Patent at 2:15-18.

Thus, "orifice" should be construed as "a hole that passes through the accessory."

### E.    Shaping Terms ('326 and '327 Patents)

| Term | POAIR Construction | Donghee Construction |
|---|---|---|
| **1.** "shaping the protruding molten plastic" ('326 Patent, claim 1; '327 Patent, claims 1 and 9) | **1.** This claim term is definite.  If an express construction is deemed necessary: "shaping the top of the protruding molten plastic to provide a self-formed plastic rivet" | **1.** Indefinite. Otherwise: "applying a counterform to deform the protruding molten plastic" |
| **2.** "the protrusion having been shaped" ('326 Patent, claim 25) | **2.** This claim term is definite.  If an express construction is deemed necessary: "the top of the protruding molten plastic having been shaped to overhang the at least one orifice" | **2.** Indefinite. Otherwise: "the protrusion having been deformed by the application of a counterform" |

The '326 and '327 Patents belong to the same patent family and share a common specification.  In the method claims of the '326 and '327 Patents, accessories are attached to the fuel tank by "forcing" some of the molten plastic of the fuel tank wall through an orifice in the accessory and "shaping" the protruding plastic "to provide a self-formed plastic rivet."  '326 Patent at claim 1; '327 Patent at claim 1.  Similarly, the apparatus claims of the '326 Patent require "the protrusion having been shaped to overhang" the orifice.  '326 Patent at claim 25.  Donghee contends that the "shaping" and "having been shaped" limitations render the claims

17

impermissibly ambiguous; Plastic Omnium disagrees.

The ambiguity in the method claims arises because they refer to a "self-formed plastic rivet." However, a rivet that is made by *deliberately shaping the plastic* into the form of a rivet is, by definition, not *self*-formed. Claims that are internally inconsistent or nonsensical are invalid as indefinite. *See Trustees of Columbia Univ. in City of N.Y. v. Symantec Corp.*, 811 F.3d 1359, 1366–67 (Fed. Cir. 2016) ("The claims are nonsensical in the way a claim to extracting orange juice from apples would be, and are thus indefinite."); *Tech. Innovations, LLC v. Amazon.com, Inc.*, 35 F. Supp. 3d 613, 620 (D. Del. 2014) (finding indefinite claim that contained an "inherent logical contradiction").

The apparatus claims are ambiguous because the phrase "the protrusion having been shaped to overhang" the orifice can be read to mean that the protrusion is either actively shaped or shaped by the law of nature whereby molten plastic takes on some form. Thus, the apparatus claims are indefinite because they do not, with reasonable certainty, inform a person of ordinary skill in the art as to which types of shaped protrusions fall within the scope of the claim. *See Nautilus, Inc.*, 134 S. Ct. at 2129.

To the extent the Court does not want to invalidate the claims for being indefinite, then it should at least resolve the ambiguities raised above by construing the proposed terms as requiring the deliberate application of a counterform to deform the protruding plastic. This construction is supported by the patents' common specification, which describes the shaping process only in terms of applying a counterform to deform the protruding plastic:

- "the stake-fastening is preferably performed with… a counterform actuated by a ram on the core side (so as to deform the material which has protruded through the orifice)" ('326 Patent at 4:65-5:2);

- "material of the wall of the tank (1) has been forced through this orifice (5) … and has been deformed on the inside of the tank by a counterform (7)" ('326 Patent at 6:22-25);

- "[i]t is also often advantageous from a technical standpoint to contrive for the molten plastic not to entirely fill the orifice, and for this to be achieved by means of an appropriate tool (counterform)" ('326 Patent at 3:54-57); and

- "[i]n the case illustrated in FIG. 2, the circular plateau (8) has been deformed (rendered oblong) by an appropriate relief (9) on the counterform (7)" ('326 Patent at 6:45-47).

Moreover, the specification and originally filed claims of both patents recite that "the protruding molten plastic is given an appropriate shape," which unambiguously requires a user to affirmatively give the plastic a shape. *See* Revised Joint Claim Construction Chart (D.I. 83), Ex. J3 at PO_00001501-1503, Ex. J4 at PO_00001766; *see also* '326 Patent at Abstract, 2:24-26. Plastic Omnium's proposed constructions do not resolve the ambiguity in the claims and would not be helpful to the jury, as they simply add the word "top" and import the surrounding claim language into the phrase. The only way to avoid finding these terms indefinite is to construe them to require deliberate shaping by applying a counterform as set forth in Donghee's constructions.

### F.    "Stretched" ('228 Patent)

| Term | POAIR Construction | Donghee Construction |
|------|--------------------|-----------------------|
| "stretched" ('228 Patent, claim 1) | Plain and ordinary meaning, otherwise the term "bend which is stretched" means: "bend which is elongated relative to its relaxed state" | "extended in length by pulling" |

The invention of the '228 Patent is directed to the attachment of pipes to the tank during molding, "where shrinking problems" can occur. '228 Patent at 3:33-36. Shrinkage problems arise because hot plastic shrinks when it cools. *Id.* at 1:30-37. According to the patent, a molded plastic fuel tank "suffers an appreciable amount of shrinkage" as it cools. *Id.* Because the pipes that are attached to a fuel tank are not as hot as the tank when they are attached and may be made of different materials, they do not shrink by the same amount as the tank. *Id.* This differential

can lead to deformations and stresses in the tank.  *Id.* at 1:37-41.

The '228 Patent purports to solve shrinkage problems by using a pipe with a bend that "allows the pipe to be *lengthened* when stretched."  '228 Patent at 3:47-55 (emphasis added). The bend "makes a sort of spring in the pipe, which is stretched during the fastening of the pipe… such that it is preferably at rest (or almost at rest) when the moulded tank is cooled."  *Id.* at 3:59-62.  Below, Figure 3 of the patent shows a pipe that has been pulled so that it is in a "stretched state," *i.e.*, lengthened state, when it is installed onto a hot fuel tank.  *Id.* at 5:33-36. And Figure 2 shows the pipe shortened after the tank has cooled and shrunk.  *Id.*  Thus, the specification, including the figures, show that "stretched" means "extended in length by pulling."



Donghee's construction of stretched is confirmed by the extrinsic evidence.  "Stretch" is commonly defined as "to widen, lengthen, or distend by pulling."  Ex. 8, Webster's II; *see also* Ex. 9, Webster's Unabridged ("to draw tight or taut" and "to lengthen, widen, distend or enlarge by tension"); Ex. 7, Webster's Collegiate ("to extend in length" and "to pull taut").

 Accordingly, a person of ordinary skill in the art would understand that when the '228 Patent requires that a pipe with a bend is "stretched," it means "extended in length by pulling."

## IV.  <u>CONCLUSION</u>

For the at least the foregoing reasons, the Court should adopt Donghee's proposed constructions and further find claims 1 and 25 of the '326 Patent, claims 1 and 9 of the '327 Patent, and all claims that depend therefrom, invalid as indefinite.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By:  */s/  Philip A. Rovner*
     Philip A. Rovner (#3215)

Alyssa Caridis
ORRICK, HERRINGTON &
SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, CA 90017-5855
(213) 629-2020

     Jonathan A. Choa (#5319)
     Hercules Plaza
     P.O. Box 951
     Wilmington, DE 19899-0951
     (302) 984-6000
     provner@potteranderson.com
     jchoa@potteranderson.com

Nicholas H. Lam
ORRICK, HERRINGTON &
SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
(212) 506-5000

*Attorneys for Defendants*
*Donghee America, Inc. and*
*Donghee Alabama, LLC*

Dated:  April 26, 2017
Public Version dated:  May 3, 2017
5111295