## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **Plastic Omnium Advanced Innovation and Research**, | |
| Plaintiff, | Civil Action No. 16-0187-LPS-CJB |
| v. | **Jury Trial Demanded** |
| | **PUBLIC VERSION** |
| **Donghee America, Inc. and Donghee Alabama, LLC**, | |
| Defendants. | |

### PLASTIC OMNIUM ADVANCED INNOVATION AND RESEARCH'S
### OPENING CLAIM CONSTRUCTION BRIEF

BARNES & THORNBURG LLP
Chad S.C. Stover (No. 4919)
Regina S.E. Murphy (No. 5648)
1000 N. West Street, Suite 1500
Wilmington, Delaware 19801-1050
(302) 300-3474
chad.stover@btlaw.com
gigi.murphy@btlaw.com

*Attorneys for Plaintiff*

OF COUNSEL:
Robert C. Mattson
Eric W. Schweibenz
Frank J. West
Vincent K. Shier
Christopher Ricciuti
Katherine D. Cappaert
OBLON, McCLELLAND, MAIER & NEUSTADT, L.L.P.
1940 Duke Street
Alexandria, VA 22314
(703) 413-3000

Dated:  April 26, 2017
Public Version filed on: May 3, 2017

# TABLE OF CONTENTS

I.   Introduction .............................................................................................................1

II.  Legal Standard .........................................................................................................1

III. Disputed Claim Terms .............................................................................................2

    A.   '921 Patent and '812 Patent Parison Terms .................................................2

    B.   "split or at least two part parison"................................................................6

    C.   '604 Patent and '228 Patent "extruded tubular parison" terms .....................7

    D.   Molding Terms .............................................................................................8

    E.   "inserting a core into the parison during the blow-molding"........................12

    F.   "preassembled structure" ...........................................................................13

    G.   "shaping the protruding molten plastic" .....................................................14

    H.   "the protrusion having been shaped" ..........................................................16

    I.   "stretched".................................................................................................18

    J.   "orifice".....................................................................................................19

IV.  Conclusion ..............................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Idenix Pharms. L.L.C. v. Gilead Scis., Inc.*,
  2016 U.S. Dist. LEXIS 158513 (D. Del. Nov. 16, 2016) ....................................................1

*Kara Tech. Inc. v. Stamps.com Inc.*,
  582 F.3d 1341 (Fed. Cir. 2009) ..................................................................................... 12

*Linear Tech. Corp. v. ITC*,
  566 F.3d 1049 (Fed. Cir. 2009) ............................................................................... 16, 17

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014) ............................................................................................. 15, 17

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) .................................................................... *passim*

*Renishaw PLC v. Marposs Societa' per Azioni*,
  158 F.3d 1243 (Fed. Cir. 1998) ........................................................................................ 2

*Riverwood Int'l Corp. v. R.A. Jones & Co.*,
  324 F.3d 1346 (Fed. Cir. 2003) .................................................................... *passim*

*Ruckus Wireless, Inc. v. Innovative Wireless Sol., L.L.C.*,
  824 F.3d 999 (Fed. Cir. 2016) ......................................................................................... 5

*Thorner v. Sony Comput. Entm't Am. L.L.C.*,
  669 F.3d 1362 (Fed. Cir. 2012) ...................................................................................... 8

*Varian Med. Sys. v. Elekta AB*,
  2017 U.S. Dist. LEXIS 21921 (D. Del. Feb. 16, 2017) ................................................. 15

*Vitronics Corp. v. Conceptronic*,
  90 F.3d 1576 (Fed. Cir. 1996) ................................................................................. 1, 15

*Yodlee, Inc. v. Plaid Techs., Inc.*,
  2016 U.S. Dist. LEXIS 5603 (D. Del. Jan. 15, 2016) ............................................. 15, 17

## I.    Introduction

In this action, Plaintiff Plastic Omnium Advanced Innovation and Research has asserted infringement of eight patents related to the manufacture of automotive fuel tanks against Defendants Donghee America, Inc. and Donghee Alabama, LLC (collectively, "Donghee"). Plastic Omnium's patented fuel-tank manufacturing processes are known in the industry as "twin-sheet blow molding" or "TSBM." A tutorial describing Plastic Omnium's patented fuel-tank manufacturing technology has been submitted herewith.

Further, and pursuant to the Court's March 24, 2017 Oral Order (D.I. 75), the parties have met and conferred to reduce the number of disputed claim terms in connection with the June 26, 2017 *Markman* hearing to ten. Additionally, a revised Joint Claim Construction Chart has been submitted herewith to reflect minor adjustments to some of the parties' proposed constructions. Because Plastic Omnium's proposed constructions most closely align with the patent's description and other intrinsic evidence, the Court should adopt Plastic Omnium's proposed constructions.

## II.   Legal Standard

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). Courts look to "the words of the claims themselves ... to define the scope of the patented invention." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Additionally, the patent's specification and prosecution history should be considered. *Id.* at 1315, 1317. A court may also consider extrinsic evidence, however extrinsic evidence is less reliable and should be given less weight. *Id.* at 1317-19. Overall, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Idenix Pharms. LLC v.*

1

*Gilead Scis., Inc.*, 2016 U.S. Dist. LEXIS 158513 at *7-8 (D. Del. Nov. 16, 2016) (Stark, J.)

(quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

## III.  Disputed Claim Terms

### A.  '921 Patent and '812 Patent Parison Terms

| Claim Terms | Plastic Omnium's Proposed Construction | Donghee's Proposed Construction |
|---|---|---|
| 1. "extruded parison of closed cross section" ('921 patent, cl. 1, 2-5, 8, and 9)  2. "extruding a [multilayered] parison" ('812 patent, cl. 16, 25, 27, 30-32, 39, 41, 44, and 45) | 1. "an extruded plastic body having a closed cross section"  2. "extruding a [multilayered] plastic body having a closed cross section" | 1. "a plastic tube with a closed cross section formed by forcing plastic through a die"  2. "forcing plastic through a die head to form a plastic tube [of multiple layers] with a closed cross section" |

Although Donghee asks this court to construe the phrases "extruded parison of closed cross section" and "extruding a [multilayered] parison" in the '921 and '812 patents, respectively, the true dispute centers on the asserted patents' use of the term "parison." Plastic Omnium's proposed construction, which is supported by the patents' detailed description and express definitions applied therein, should be adopted.

The '812 patent defines the term "extruded parison" to mean "the product obtained by passing, through a die, a composition of at least one thermoplastic melt homogenized in an extruder whose head is terminated by the die. According to the invention, the parison has a closed cross section." '812 patent, col. 2:35-39. Stated more simply, and as explained by Plastic Omnium's expert, Dr. Osswald, the patents define a parison as "an extruded plastic body of closed cross section," which will eventually be used to form the wall of the fuel tank after molding. (*See* Ex. 1, ¶¶ 22-23.)[1] Significantly, Plastic Omnium's related '604 patent defines

---

[1] Exhibit 1 submitted herewith is the Declaration of Dr. Tim A. Osswald in support of Plastic Omnium's Opening Claim Construction Brief.

"parison" in this exact manner: "The term 'parison' is understood to mean [] a preform, generally extruded, which is intended to form the wall of the tank after being molded to the required shape and dimensions." Col. 4:64-67. On the other hand, Donghee's narrowing construction is an apparent attempt to manufacture a noninfringement argument and, thus, should be rejected.

Donghee suggests that the term "parison" must be limited to a "plastic tube," but the patents and prosecution histories do not support this narrow construction. Donghee is conflating the use of the term "parison" in conventional blow molding with the use of the term "parison" in Plastic Omnium's improved and novel fuel-tank manufacturing process disclosed in the asserted patents. In conventional blow molding, a long, hollow plastic tube would exit the die of an extrusion head before the fuel-tank mold closed around the plastic tube and air was blown in to form the shape of the fuel-tank wall. (*See* Ex. 1, ¶¶ 15-16, Fig. 1.) But, to overcome the difficulty and inefficiencies of inserting large components inside of conventional, tube-shaped parisons, Plastic Omnium developed an unorthodox fuel-tank manufacturing technique that employs twin-sheet blow-molding technology. This technology, disclosed in the asserted patents (and illustrated in Ex. 1, Fig. 5), uses a traditional extrusion head to form a parison that is split or cut into two sheets of plastic as it is being extruded. The two sheets of plastic are molded to form the top and bottom of the fuel tank. *See, e.g.*, '921 patent, Fig. 1, col. 3:8-11, 3:24-38, 5:17-38; '812 patent, Fig. 1, col. 1:54-57, 2:35-54, 3:9-40, 5:23-41.

In other words, when the asserted patents use the term "parison," they do not demand that a traditional, plastic test-tube-like structure (such as a test tube seen at the doctor's office) be formed outside of the extrusion head/die but, instead, dictate that the plastic preform created by a conventional extrusion head be split to provide ready access to what will become the fuel tank's interior walls. (Ex. 1, ¶¶ 18, 22-23, Fig. 4.) The specifications' reference to a "parison" being

3

"the product obtained by passing, through a die, a composition of at least one thermoplastic melt homogenized in an extruder whose head is terminated by the die," '812 patent, col. 2:35-39, explains to one of ordinary skill in the art that a conventional extrusion head is being used to form the plastic body that will be made into a fuel tank, but it should not be confused with a requirement that the disclosed inventions are limited to forming a complete plastic tube outside of the extrusion head/die before cutting the parison. (Ex. 1, ¶¶ 18, 22-23.)

This is also precisely what is recited by the asserted claims of the '921 and '812 patents: "cutting and opening an extruded parison" ('921 patent, claim 1) "cutting through said multilayered parison so as to form two portions separated by a cut" ('812 patent, claim 16). Neither the literal language of the claims nor the asserted patents' specifications require a plastic tube to form outside of the extrusion head/die. (Ex. 1, ¶¶ 18, 22-23, Fig. 4.) In fact, the only examples disclosed in the '921 and '812 patents describe cutting or splitting the parison as it exits the extrusion head, so a "plastic tube" is never created in the described embodiments. *See, e.g.*, '921 patent, col. 3:1-7, 3:24-27, 5:24-27; '812 patent, col. 2:46-48, 3:9-14, 5:23-30. The asserted patents' disclosure in this regard is broad, and the claimed "parison" may be split (1) within the extrusion head/die, (2) at the exit of the extrusion head/die, consistent with the preferred embodiment, or (3) even after a plastic tube has exited the extrusion head/die. Importantly, however, because the asserted patents do not limit the term "parison" to only a plastic tube fully formed outside of the extrusion head/die, the proper construction of this term must be broad enough to encompass the extruded plastic body that will ultimately form the fuel tank's walls after being split. Plastic Omnium's proposed construction—an extruded plastic body having a closed cross section—does just that. Donghee's proposed construction, on the other hand, should be rejected as a product of one of the "cardinal sins" of patent law: reading a

4

limitation from the specification (*i.e.*, forming a "plastic tube ... by forcing plastic through a die") into the claims. *Phillips*, 415 F.3d at 1320; *Ruckus Wireless, Inc. v. Innovative Wireless Solutions, LLC*, 824 F.3d 999, 1009 (Fed. Cir. 2016) (Stark, J. Dissent).

Moreover, Donghee's own pre-litigation, contemporaneous technical documents— provided from the company that supplied Donghee its TSBM equipment—use the term "parison" in the same manner proposed by Plastic Omnium. In these documents the parison is a plastic body having a circular cross section that is split as it is extruded from the co-extrusion head (also called the blow head) and before the creation of a "plastic tube." (Ex. 2 at 3-4; Ex. 3 at 4; Ex. 4 at 13-14, 104.) The asserted patents simply do not require Donghee's narrow construction of a parison only being satisfied if a "plastic tube" is formed outside of the extrusion head.

Additionally, while the detailed example within the '921 and '812 patents states that the extrudate, or parison, may be "tubular" ('921 patent, col. 5:24; '812 patent, col. 5:23), a person having ordinary skill in the art at the time of the invention would understand this disclosure to mean that the parison is of a closed cross section and hollow, but not that a fully-formed test-tube-like structure must extend outside of the extrusion head/die. (Ex. 1, ¶ 22.) Moreover, when using a circular extrusion head to create a split parison and two separate sheets of plastic as the asserted patents describe, forming a hollow, closed cross-sectional plastic body is a matter of technical necessity: without a conventional extrusion head forming this shape, two sets of sheet extruders would be required, in contrast to the single extruder used in the asserted patents, Plastic Omnium's TSBM technology, and Donghee's accused process. (Ex. 1, ¶ 19, Fig. 5.) In fact, looking at the '921 and '812 patents' Figure 1, the tubular parison is seen within the extrusion head (2), and both patents place the blades (3) for cutting the parison at the *exit* of the circular die, so that no tube of plastic is ever formed outside the die. '921 patent, col. 5:24-27; '812

patent, col. 5:23-30. There is no requirement whatsoever in the claims, specification, or prosecution history that the term parison, or "extruded plastic body of closed cross section," must be formed outside of the extrusion head itself. (Ex. 1, ¶¶ 18-19, 22-23.)

Here, the entire thrust of the claimed inventions is to replace conventional technologies that required forming plastic tube-like parisons. And, although the asserted patents continue to use this common blow-molding term (*i.e.,* "parison"), it was not to limit the claimed inventions to only splitting plastic tubes that have exited the extrusion head/die, but to inform those of ordinary skill in the art at the time of the inventions that the plastic body formed by a circular extrusion head is split before subsequent blow-molding steps are carried out. Accordingly, the Court should adopt Plastic Omnium's proposed constructions, which align with the asserted patents' written description and are broad enough to cover this central aspect of Plastic Omnium's claimed technology.

**B.   "split or at least two part parison"**

| Claim Term | Plastic Omnium's Proposed Construction | Donghee's Proposed Construction |
|---|---|---|
| "split or at least two part parison"<br><br>('327 patent, cl. 1, 7, 9, and 15) | Plain and ordinary meaning. If an express construction is deemed necessary: "a plastic body for blow-molding that is split or made into two parts" | "a plastic tube with a closed cross section formed by forcing plastic through a die, which is then cut" |

The disputed term "split or at least two part parison" raises similar issues as the "parison" terms recited in the '921 and '812 patents. The dispute between the parties is whether the term requires an extruded "plastic tube" to exit an extrusion head and then be cut, or whether the claim is more appropriately directed to a plastic body for blow-molding that is split or made into two parts, regardless of where the splitting occurs. As explained above, the asserted patents do not require a "parison" to be a "plastic tube" formed outside of the extrusion head and, thus, by

logical extension, they do not require that a split or at least two-part parison must be cut from a "plastic tube."

Moreover, the asserted patents never equate a parison to a plastic tube and, in fact, never describe a plastic tube. Rather, as the '327 patent explains, the ability to install components on the interior wall of the fuel tank "benefits from the fact that a parison is melted during its moulding, and that it can be opened up (*i.e.*, split or made up of two independent parts that can be parted from one another)," without requiring the splitting of a formed plastic tube that has exited the extrusion head. '327 patent, col. 1:64 – 2:1, *see also* 4:40-54, 5:4-19. The Court should therefore adopt Plastic Omnium's proposed construction, which is "a plastic body for blow-molding that is split or made into two parts."

### C.   '604 Patent and '228 Patent "extruded tubular parison" terms

| Claim Terms | Plastic Omnium's Proposed Construction | Donghee's Proposed Construction |
|---|---|---|
| "extruded tubular parison" ('604 patent, cl. 8; '228 patent, cl. 2) | "extruded tubular preform intended to form the wall of the fuel tank after molding" | "tubular preform intended to form the wall of the fuel tank after molding, formed by forcing plastic through a die" |

Dependent claim 8 of the '604 patent and dependent claim 2 of the '228 patent specify that the "parison" introduced in each patent's independent claim 1 is an "extruded tubular parison." The proper construction of this term is apparent and unambiguous from the patentee's lexicography in the '604 patent, which specifically defines "parison" as "a preform, generally extruded, which is intended to form the wall of the tank after being molded to the required shape and dimensions." '604 patent, col. 4:64-67; *see also* '228 patent, col. 2:33-37. When the "extruded tubular" modifier is added to the term "parison," the full claim phrase should simply read, as proposed by Plastic Omnium, "extruded tubular preform intended to form the wall of the fuel tank after molding."

As before, the dispute between the parties is whether the term "extruded tubular parison" should be incorrectly narrowed to require a plastic tube to exit an extrusion/die head before it is cut into two sheets. But, as discussed above, the asserted patents never form a tube outside of the extrusion head. Moreover, in the context of the asserted patents, a "tubular" body is not limited to a fully-formed test-tube-like structure extending outside of the extrusion head/die, but simply indicates that the molten plastic preform is evenly distributed in a hollow, closed cross-sectional shape. (Ex. 1, ¶ 22.) Because Donghee's proposed claim construction unnecessarily requires the formation of a test-tube-like structure outside of the extrusion head/die, which is not disclosed in either the '604 or '228 patents, it should be rejected. *Phillips*, 415 F.3d at 1320.

### D. Molding Terms

| Claim Terms | Plastic Omnium's Proposed Construction | Donghee's Proposed Construction |
|---|---|---|
| 1. "during the operation of molding the shell" and "during molding" ('921 patent, cl. 5 and 9)<br><br>2. "at the same time as said tank is manufactured by moulding with a mould" ('490 patent, cl. 1, 2, 7, 8, and 12-14)<br><br>3. "at the time of manufacture of the tank when moulding" ('327 patent, cl. 1 and 7) | Plain and ordinary meaning. If an express construction is deemed necessary:<br><br>1. "during the processing of forming the tank shell and before joining the shells"<br><br>2 & 3. "during the blow molding process" | 1. "while the sheet is being compression and/or blow molded to form the shell"<br><br>2 & 3. "while the plastic is being thermoformed or blow molded to form the tank" |

The Court does not need to construe the disputed "molding" terms because they use common terms with simple meanings that are "readily apparent" and should be given their plain and ordinary meaning. *See Phillips*, 415 F.3d at 1313; *see also Riverwood Int'l. Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1357 (Fed. Cir. 2003). Moreover, the patentee did not assign these terms any special meaning and did not expressly disclaim or disavow any scope related to the terms in either the specification or during prosecution. *Thorner v. Sony Computer Ent. Am. LLC,*

669 F.3d 1362, 1365 (Fed. Cir. 2012). The plain language of these terms simply requires the

recited method step to occur at some point "during the blow molding process"—*i.e.*, when the

plastic sheets are still in a molten/pliable state and prior to the sheets being joined and sealed

together to form a completed fuel tank. (Ex. 1, ¶¶ 20, 24-26, Fig. 6.)

      The dispute between the parties centers on Donghee's attempt to again narrow these

terms for noninfringement purposes, and more specifically, to cover only the precise point in

time during the overall manufacturing process when the fuel tank's wall is physically changing

shape either by blow molding (injected air) or thermoforming (vacuum pressure). Nothing in the

language of the claims themselves or their corresponding specifications, however, supports

Donghee's narrow definition.

      For example, the '921 patent's claims state that "during the operation of molding the

shell," there is a "simultaneous molding onto the shell of at least one fuel tank accessory by flow

of the sheet" (claim 5), and that "during molding" at least one fuel tank accessory is welded or

fixed to the fuel-tank sheet (claims 8 and 9). The simultaneous molding or fixing of the

accessories to the fuel-tank wall requires only that the accessory be attached to the plastic sheet

when it is in a molten/pliable state and before completion of joining the two shells. (Ex. 1, ¶¶ 20,

24-26.) This precise and common-sense understanding is supported by the '921 patent's

specification: "After the operation of joining the two shells together, the tank may undergo any

type of surface treatment…. *After the molding operation*, the shell advantageously undergoes

deflashing of material…." '921 patent, col. 4:66 – 5:9 (emphasis added). Thus, the specification

makes clear that the "molding operation" is the entire manufacturing process before the

completion of joining the fuel-tank shells together—anything occurring prior to that will be done

"during molding." (Ex. 1, ¶¶ 24-25.) Contrary to Donghee's proposed constructions, the asserted

patents' specifications do not limit the "blow molding" process to any particular time period or blow-molding step. The same understanding is imparted by both the claims and the specification of the '490 and '327 patents.

In the '490 patent, independent claim 1 states that an accessory is fastened to the wall of a plastic fuel tank "at the same time as said tank is manufactured by molding," again, connoting that the accessory attachment occurs during the overall molding operation and before the completion of sealing of fuel tank into a unitary structure. The '490 patent's specification describes the same to a person having ordinary skill in the art at the time of the invention, distinguishing the process of being molded from the post-molding stage that starts after final joining of the tank shells: the "accessory is fastened to the wall of the tank while it is being moulded" as opposed to during "the post-moulding shrinkage" process when the fuel tank is cooling after the tank shells have been joined together. '490 patent, col. 4:58-62.

Similarly, the '490 patent describes the use of a central core to fasten accessories onto the interior wall of the fuel tank when the plastic is molten/pliable, col. 3:40-47, and prior to "removing the core, reclosing the mold *and final moulding of the tank*," establishing that accessory attachment occurs when the plastic sheets are still in a molten/pliable state and prior to completion of the molding process when the sheets are finally joined and sealed together. '490 patent, col. 6:45-47, *see also* 5:33-45, 6:37-47; Ex. 1, ¶¶ 20, 24-25. The specification also makes clear that when the core is used to fasten accessories to the interior wall of the fuel tank, it "*may* also be used to introduce the pressurized gas needed for blow-molding," with the word "may" indicating that it is not mandatory. '490 patent, col. 5:48-49 (emphasis added). There is no requirement in the '490 patent, or any of the other asserted patents, that accessories must be

fastened to the fuel tank wall at the same time air is being blown into the mold to shape the wall of the fuel tank.

In the '327 patent, independent claims 1 and 7 require the accessory fastening process to occur "at the time of manufacture of the [multilayer plastic] fuel tank when molding" which, once again, means that the fastening process occurs while the plastic is in a molten state and before the fuel-tank shells have been sealed together. *See, e.g.*, '327 patent, col. 2:29-34, 5:4-19 (describing fastening accessories and then "closing the mould again and blowing in a conventional manner"), 6:27-39. In fact, during prosecution of the '327 patent, Plastic Omnium distinguished its invention from fastening techniques that were not conducted "during the manufacture of the tank ... while parison 12 is still warm and at least partially pliable." (*See* D.I. 74, Ex. J7 at PO_00001864, PO00001916, PO_00001965-1966.) In other words, Plastic Omnium distinguished its claimed invention from prior art where the rivet-forming step occurs after the plastic is cooled and is no longer partially pliable. *See also* '327 patent, col. 2:17-28 (describing the invention as relating to fastening an accessory to the interior wall of the fuel tank utilizing molten plastic from the fuel-tank wall), 3:35-44 (same), 5:4-18 (same).

Donghee's own technical documentation confirms that molding is the entire process leading up to the final sealing of the tank-shell halves and not merely the step of shaping the shells with positive or negative pressure. In particular, Donghee's flow charts show that the blow-molding process includes all steps from extruding the parison to removing the sealed tank shell from the mold and trimming off excess material. (*See* Ex. 5 at DONGHEE_0010893; Ex. 6 at DONGHEE_0010895.) Thus, Donghee's own pre-litigation, contemporaneous documentation acknowledges that engineers in the field of molding do not view "blow molding" as limited to the time periods when air is blown into the mold to shape the wall of the fuel tank.

11

Lastly, but perhaps most importantly, in contrast to the molding terms recited in the asserted patents, Plastic Omnium's U.S. Patent No. 8,591,798—the parent to the asserted '326 and '327 patents—specifically requires accessory attachment to be "performed *during an initial closing of the mould* by bringing said moulding cavities around the core." (*See* D.I. 1, Ex. K, col. 7:25-27 (emphasis added), 8:21-22.) This language is entirely absent from the asserted patents' claims such that attachment need only occur "during molding," or prior to the final sealing of the blow-molded fuel tank. *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1347 (Fed. Cir. 2009) (finding the use of different terms in related patents to mean different things). Donghee's attempt to unnecessarily limit the scope of the asserted claims to a particular time period during the blow-molding process, which is neither supported by the plain language of the claims or the patents' specifications, should be rejected.

## E.   "inserting a core into the parison during the blow-molding"

| Claim Term | Plastic Omnium's Proposed Construction | Donghee's Proposed Construction |
|---|---|---|
| "inserting a core into the parison during the blow-molding"<br><br>('604 patent, cl. 1, 2, 4, 7, and 8) | Plain and ordinary meaning. If an express construction is deemed necessary: "inserting a core into the parison during the blow-molding process" | "inserting a core into the parison, then injecting pressurized gas to form the fuel tank" |

The disputed term "inserting a core into the parison during the blow-molding" raises similar issues as the molding terms recited in the '921, '490, and '327 patents. Despite the plain language of this claim, which does not require an express construction, the dispute between the parties centers on Donghee's attempt to yet again narrow the subject term to cover (1) only the precise point in time during the overall manufacturing process when the shape of the wall of the fuel tank is being formed by pressurized gas (*i.e.*, an initial blowing step), and (2) that the

described and claimed core that is used in the accessory fastening process is inserted prior to this initial blow step.

However, as explained above, unlike the claims of Plastic Omnium's '798 patent (no longer asserted against Donghee), there is no requirement in the asserted patents that accessories are fastened during an initial blowing step when the shape of the fuel-tank wall is initially formed and, thus, the claims of the '604 patent are not limited to first inserting a core into the parison for use in accessory attachment and then injecting pressurized gas to form the shape of the fuel tank as urged by Donghee. Indeed, this embodiment in the specification where pressurized gas is blown from the core is referred to as a "variant." '604 patent, col. 5:44-45. Rather, as the specification illuminates, "blow-molding" in the '604 patent refers to the overall molding process used to manufacture a fuel tank and, thus, the claim's requirement that a core be inserted "during molding" for use in attaching accessories dictates only that this be done when the plastic is molten/pliable and before the final sealing of the fuel-tank shells. '604 patent, col. 2:7-20, 4:63-5:14. Accordingly, Plastic Omnium's plain language interpretation of the claim terms—"inserting a core into the parison during the blow-molding process"—should be adopted.

### F.   "preassembled structure"

| Claim Terms | Plastic Omnium's Proposed Construction | Donghee's Proposed Construction |
|---|---|---|
| "preassembled structure" ('812 patent, cl. 40, 41; '253 patent, cl. 1, 2, 3, 11, 12, and 14) | Plain and ordinary meaning.  If an express construction is deemed necessary: "a premade structure" | "a set of multiple parts previously joined into a single arrangement that attaches to at least several accessories" |

The term "preassembled structure" does not require construction under the "heavy presumption" that a claim term should be given its plain and ordinary meaning. *Riverwood Int'l Corp.*, 324 F.3d at 1357. To the extent, however, that this term needs construction, Plastic

Omnium's alternative proposal is consistent with the claims' plain language and the intrinsic and extrinsic evidence.

The specification explains that the claimed "preassembled structure" is a support structure for the accessories (*e.g.,* "liquid pumps, pipettes, reservoirs or baffles internal to the hollow body, and ventilation devices") that are introduced and fastened to the interior wall of the fuel tank. '812 patent, col. 4:4-9. As a result, the "preassembled structure" includes a feature or portion designed to anchor the preassembled structure to the fuel tank's interior wall. '812 patent, col. 4:14-40. Structurally, however, the specification requires only that the "preassembled structure" be produced in a separate process from the blow-molded fuel tank—*i.e.*, the "preassembled structure" is a "premade structure" inserted into the fuel-tank rather than a support structure formed from the blow-molded, plastic fuel-tank wall. '812 patent, col. 4:4-10. Other than being pre-made, the specification does not require a specific structure or design for the "preassembled structure," let alone that it must consist of multiple parts or that it must attach to several accessories, as Donghee asserts. Thus, by construing the claim as requiring a set of multiple parts, Donghee is attempting to improperly narrow the scope of the claim by reading in limitations that are not even supported by the specification. *Phillips*, 415 F.3d at 1320. This is improper and the Court should thus adopt Plastic Omnium's proposed construction.

### G. "shaping the protruding molten plastic"

| Claim Terms | Plastic Omnium's Proposed Construction | Donghee's Proposed Construction |
|---|---|---|
| "shaping the protruding molten plastic" ('326 patent, cl. 1 and 13; '327 patent, cl. 1, 7, 9, and 15) | This claim term is definite. If an express construction is deemed necessary: "shaping the top of the protruding molten plastic to provide a self-formed plastic rivet" | Indefinite; if not, "applying a counterform to deform the protruding molten plastic" |

14

A person having ordinary skill in the art at the time of the invention would understand the meaning of the term "shaping the protruding molten plastic" with reasonable certainty and it is thus sufficiently definite. A patent claim is indefinite only if, when "viewed in light of the specification and prosecution history, [it fails to] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). A party asserting indefiniteness "has the burden of establishing invalidity, which generally must be proven by clear and convincing evidence." *Varian Med. Sys. v. Elekta AB*, 2017 U.S. Dist. LEXIS 21921 at *14 (D. Del. Feb. 16, 2017) (Stark, J.). Additionally, when assessing indefiniteness, it is important to consider the patent's claims, because they "provide substantial guidance as to the meaning of particular claim terms.'" *Yodlee, Inc. v. Plaid Techs., Inc.*, 2016 U.S. Dist. LEXIS 5603 at *26 (D. Del. Jan. 15, 2016) (Stark, J.) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 2006)). Donghee cannot meet its high burden of establishing indefiniteness and has divorced its analysis from the claim terms themselves.

Dr. Osswald explains that "shaping the protruding molten plastic" is done to achieve a specific purpose, which is defined by the '326 and '327 patents' claim language and specifications. (Ex. 1, ¶¶ 28-29.) For example, claim 1 of the '326 patent recites the purpose for "shaping the protruding molten plastic" is "to provide a self-formed plastic rivet." Similarly, claim 1 of the '327 patent recites the same purpose and also includes a "whereby" clause explaining that the resulting shaped plastic is "such that the accessory is mechanically fastened to the tank." Additionally, the specification repeatedly states that the purpose of shaping the protruding molten plastic is to form a plastic rivet. *See, e.g.,* '326 patent, col. 2:24-26, 3:35-48. A person having ordinary skill in the art at the time of the invention would understand that this

purpose would be achieved by shaping the top of the protruding molten plastic. (Ex. 1, ¶¶ 28-29.) Thus, as Dr. Osswald explains, the claim language and the specification would inform a person having ordinary skill in the art at the time of the invention with reasonable certainty that the term simply means "shaping the top of the protruding molten plastic to provide a self-formed plastic rivet." (Ex. 1, ¶¶ 28-30.) Accordingly, the term is sufficiently definite.

Donghee's alternative (and strained) construction of "shaping" as requiring the use of "a counterform to deform the protruding molten plastic" is improper because it limits the claims to a preferred embodiment. *Linear Tech. Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1058 (Fed. Cir. 2009). The claims, however, are not limited to this embodiment and do not require the use of any specific method or tool for "shaping the protruding molten plastic"—only that a rivet is created to mechanically fasten the accessory to the fuel-tank wall. As Dr. Osswald explains, upon reading the specifications of the asserted patents, a person having ordinary skill in the art at the time of the invention would have known that the plastic could be shaped in a variety of different ways to mechanically fasten the accessory to the fuel-tank wall. (Ex. 1, ¶¶ 21, 29.) The Court should therefore not limit the term to a particular embodiment and should adopt Plastic Omnium's proposed construction.

## H. "the protrusion having been shaped"

| Claim Terms | Plastic Omnium's Proposed Construction | Donghee's Proposed Construction |
|---|---|---|
| "the protrusion having been shaped" ('326 patent, cl. 25-27, 33-34, and 44) | This claim term is definite. If an express construction is deemed necessary: "the top of the protruding molten plastic having been shaped to overhang the at least one orifice" | Indefinite; if not, "the protrusion having been deformed by the application of a counterform" |

A person having ordinary skill in the art at the time of the invention would understand the meaning of the term "the protrusion having been shaped" with reasonable certainty and it is thus

sufficiently definite. As discussed above, to be indefinite, a claim must fail to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc.*, 134 S. Ct. at 2129. And, as already discussed, when assessing indefiniteness, the court should consider the claim language itself because it provides "substantial guidance as to the meaning of particular claim terms." *Yodlee, Inc.*, 2016 U.S. Dist. LEXIS 5603 at *26.

As Dr. Osswald explains, the protrusion is shaped to achieve a specific purpose, which is defined by the '326 patent's claim language and specification. (Ex. 1, ¶¶ 28-30.) Claim 25 of the '326 patent defines that purpose as "to overhang the at least one orifice and ... hold[] the accessory in a non-removable mechanical connection to the inside wall of the multi-layer plastic fuel tank." Similarly, the specification explains that the top of the molten plastic is shaped to form a plastic rivet and create a non-removable mechanical connection. '326 patent, col. 3:33-48. Based on these disclosures, Dr. Osswald explains that a person having ordinary skill in the art would understand that the rivet is formed by shaping the top of the protrusion to overhang the orifice. Thus, a person having ordinary skill in the art at the time of the invention would have understood the disputed claim term to mean "the top of the protruding molten plastic having been shaped to overhang the at least one orifice." (Ex. 1, ¶¶ 28-30.) Accordingly, the term is sufficiently definite.

Donghee again attempts to strictly limit the claim term's scope to requiring that the protrusion be deformed by a counterform. But this limits the claims to a preferred embodiment and is simply improper. *Linear Tech. Corp.* 566 F.3d at 1058. The claims are not limited to this embodiment and do not require that the protrusion be shaped using any specific method or tool. (Ex. 1, ¶¶ 21, 29.) The Court should not limit the term to a particular embodiment and should thus adopt Plastic Omnium's proposed construction.

## I.   "stretched"

| Claim Term | Plastic Omnium's Proposed Construction | Donghee's Proposed Construction |
|---|---|---|
| "stretched" or "bend which is stretched" ('228 patent, cl. 1-4 and 7-9) | Plain and ordinary meaning.  If an express construction is deemed necessary, the term "bend which is stretched" means: "bend which is elongated relative to its relaxed state" | "extended in length by pulling" (construing "stretched" only) |

The term "stretched" is a common term with a simple meaning that is "readily apparent." *Phillips*, 415 F.3d at 1313. Thus, this term does not require construction under the "heavy presumption" that a claim term should be given its plain and ordinary meaning. *Riverwood Int'l Corp.*, 324 F.3d at 1357. Nonetheless, if an express construction of the term "stretched" is deemed necessary, the term must be construed in the context of the entire claim phrase in which it appears: "bend which is stretched." The proper construction of this phrase is a "bend which is elongated relative to its relaxed state."

The '228 patent's specification explains that during "post moulding cooling, the tank suffers an appreciable amount of shrinkage (typically around 3%) whereas the parts that were integrated into it during moulding [e.g., valves and pipes] were heated only slightly and therefore suffer much less shrinkage...." Col. 1:30-37. To account for this shrinkage during post-molding cooling, independent claim 1 recites a "pipe being deformable between [two points] by virtue of the presence of a bend which is *stretched* during the attachment of the pipe to the parison."

The specification also explains that "'[d]eformable' here means that the distance between the two points of attachment of the pipe is variable," and "'[b]end' here actually means any deformation that allows the pipe to be lengthened when stretched (such as a look—i.e., a convolution; or one or more corrugations—i.e., bellows, curls)." Col. 3:47-62, *see also* Figs. 1-3, 4:20-26, 4:56-67, 5:28-36. When read together, claim 1's recitation of a "bend which is

18

stretched" means that there is a "bend which is elongated [*i.e.*, stretched] relative to its relaxed state," so that its length can vary to account for post-molding cooling stresses and shrinkage, and ultimately return closer to its relaxed state. The specification discusses this process clearly: "This makes a sort of spring in the pipe … such that it is preferably at rest (or almost at rest) when the moulded tank is cooled." '228 patent, col. 3:55-62. Contrary to Donghee's assertions, nothing in the claim limits how the bend varies in length—pulling is not a requirement of the claims. In fact, the '228 patent's entire disclosure is directed to ensuring that the pipe is elongated when it is initially attached to the fuel-tank wall, thereby accommodating post-molding shrinkage, not to any one particular manner of stretching the accessory. Accordingly, should an affirmative construction of "stretched" be deemed necessary, Plastic Omnium's proposed construction should be adopted.

### J.  "orifice"

| Claim Term | Plastic Omnium's Proposed Construction | Donghee's Proposed Construction |
|---|---|---|
| "orifice"<br><br>('326 patent, cl. 1, 13, 25-27, 33, 34, and 44) | Plain and ordinary meaning.  If an express construction is deemed necessary: "hole" | "a hole that passes through the accessory [or support for an accessory]" |

Regarding "orifice," Donghee asks this Court, once again, to construe another common term with a simple meaning that is "readily apparent" and that does not require construction. *Phillips*, 415 F.3d at 1313; *Riverwood Int'l Corp.*, 324 F.3d at 1357. If an express construction of the term "orifice" is deemed necessary, the Court need look no further than the patentee's lexicography in the '326 patent, which defines "orifice" as synonymous with a "hole." Col. 3:34. That is, not only is the commonly understood definition of "orifice" a hole, or an opening through which something may pass (Ex. 7 at 820), but the '326 patent explains that accessories are attached to the interior wall of the fuel tank by forcing molten plastic through "an orifice

19

(hole)" to create a self-formed plastic rivet, the "orifice" or "hole" being located on the accessory itself or on a support or mounting bracket for the accessory. '326 patent col. 3:33-42, *see also* Figs. 1-4, 3:43-53, 6:43-67.

Moreover, when Donghee's proposed construction of "orifice" ("a hole that passes through the accessory [or support for an accessory]") is applied to the claim phrase in which it appears, Donghee's proposed construction becomes redundant or nonsensical. The '326 patent's claim 1 recites "the accessory has a wall portion which is equipped with at least one orifice which passes through the wall portion of the accessory" and claim 25 recites "a wall portion which is equipped with at least one orifice which passes through the wall portion of the accessory or support for an accessory." Thus, the claims themselves define the precise structural relationship of the "orifice" or "hole" with respect to the claimed wall portion of the accessory (or support for an accessory). A separate articulation of this structural relationship as part of the construction of orifice is not only unnecessary, it infuses ambiguity into an otherwise clear term. An "orifice" as used in the '326 patent is simply a "hole," and Plastic Omnium's proposed construction should be adopted.

## IV. Conclusion

For the foregoing reasons, Plastic Omnium respectfully requests that the Court adopt Plastic Omnium's proposed constructions of the disputed claim terms.

Dated: April 26, 2017
Public Version filed on: May 3, 2017

BARNES & THORNBURG LLP

*/s/ Regina S.E. Murphy*
Chad S.C. Stover (No. 4919)
Regina S.E. Murphy (No. 5648)
1000 North West Street, Suite 1500
Wilmington, DE 19801
Tel: 302-300-3434
Fax: 302-300-3456
Email: chad.stover@btlaw.com
Email: gigi.murphy@btlaw.com

*Attorneys for Plaintiff Plastic Omnium
Advanced Innovation and Research*

OF COUNSEL:

Robert C. Mattson (Admitted *pro hac vice*)
Eric W. Schweibenz (Admitted *pro hac vice*)
Frank J. West (Admitted *pro hac vice*)
Vincent K. Shier (Admitted *pro hac vice*)
Christopher Ricciuti (Admitted *pro hac vice*)
Katherine D. Cappaert (Admitted *pro hac vice*)
OBLON, McCLELLAND,
MAIER & NEUSTADT, L.L.P.
1940 Duke Street
Alexandria, VA 22314
Telephone: (703) 413-3000
Facsimile: (703) 413-2220
E-mail: rmattson@oblon.com
E-mail: eschweibenz@oblon.com
E-mail: fwest@oblon.com
E-mail: vshier@oblon.com
E-mail: cricciuti@oblon.com
E-mail: kcappaert@oblon.com