# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PLASTIC OMNIUM ADVANCED INNOVATION AND RESEARCH, | :<br>:<br>: |
| Plaintiff, | :<br>: |
| v. | : C.A. No. 16-187-LPS |
| DONGHEE AMERICA, INC. and DONGHEE ALABAMA, LLC, | :<br>:<br>: |
| Defendants. | : |

Chad S.C. Stover and Regina S.E. Murphy, BARNES & THORNBURG LLP, Wilmington, DE

Robert C. Mattson, Eric W. Schweibenz, Frank J. West, Vincent K. Shier, Christopher Ricciuti, Sasha S. Rao, and Michael D. West, OBLON, MCCLELLAND, MAIER & NEUSTADT, L.L.P., Alexandria, VA

    Attorneys for Plaintiff.

Philip A. Rovner and Jonathan A. Choa, POTTER ANDERSON & CORROON LLP, Wilmington, DE

Alyssa Caridis and Andrew J. Kim, ORRICK, HERRINGTON & SUTCLIFFE LLP, Los Angeles, CA

Vickie Feeman, ORRICK, HERRINGTON & SUTCLIFFE LLP, Menlo Park, CA

Nicholas H. Lam, ORRICK, HERRINGTON & SUTCLIFFE LLP, New York, NY

    Attorneys for Defendants.

## MEMORANDUM OPINION

May 31, 2018
Wilmington, Delaware

**STARK, U.S. District Judge:**

The Court granted the parties' request to submit additional claim construction briefing concerning four claim terms. (*See* D.I. 294, 300, 301, 305, 306) Following the Court's May 22 Order granting summary judgment of non-infringement on five of the six patents then in dispute, the parties requested that the Court construe only the term "molten plastic" in U.S. Patent No. 9,399,326 (the "'326 patent"). (*See* D.I. 314 at 1)

## I. LEGAL STANDARDS

The ultimate question of the proper construction of a patent is a question of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-91 (1996)). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted).

"[T]here is no magic formula or catechism for conducting claim construction." *Id.* at 1324. Instead, the Court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). The patent specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of

1

a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent." *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide. . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)) (internal quotation marks omitted).

In addition to the specification, a court "should also consider the patent's prosecution

history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In some cases, "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Furthermore, "statements made by a patent

3

owner during an IPR [inter partes review] proceeding . . . can be considered for claim construction." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1362 (Fed. Cir. 2017). Overall, while extrinsic evidence "may be useful" to the court, it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (quoting *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Cir. 1996)).

## II. CONSTRUCTION OF DISPUTED TERM

"molten plastic"[1]

**Plaintiff**
No construction is required.
If an express construction is deemed necessary, the plain and ordinary meaning should control, which is "a semicrystalline polymer that has at least partially melted and can be shaped (or a plasticized amorphous polymer that can be shaped)."

---

[1] This term appears in claims 1, 4, 14, 15, 25, and 35 of the '326 patent.

4

| |
|---|
| **Defendants**<br>"semicrystalline polymer above its melting temperature or amorphous polymer above its glass transition temperature" |
| **Court**<br>No construction is required. |

The '326 patent is directed to "rivet snapping" (or "stake-fastening") an accessory to the interior of a fuel tank's wall. Claim 1, for example, is a method that requires (in part) "melting at least some of the plastic of which the wall of the tank is made to form molten plastic; forcing some of the molten plastic through the orifice of the accessory without becoming detached from the remainder of the molten plastic;" and "shaping the protruding molten plastic to provide a self-formed plastic rivet, and allowing the molten plastic to solidify." ('326 patent, cl. 1; *see also id.* at 2:15-26)

The patent's specification provides that "[t]he invention is based on the idea of benefiting [*sic*] from the fact that a parison is melted during its moulding." (*Id.* at 1:62-63) "In particular, advantageously, the stake-fastening occurs at the time of moulding of the tank." (*Id.* at 4:43-44) The specification further provides that "according to the invention, the plastic of which the wall of the tank is made at the site intended for fastening the accessory is melted (which means to say in fact that it is truly subjected to fusion in the case of a semicrystalline polymer such as HDPE, but in fact means to say plasticized/softened in the case of amorphous polymers)." (*Id.* at 4:27-32) "The pasty material is then forced through the orifice of the accessory without detaching from the wall of the tank, and to solidify there." (*Id.* at 4:32-35; *see also id.* at 3:40-41 (rivet is formed "from molten plastic from the wall of the tank"))

Plastic argues that a person of ordinary skill in the art ("POSA") would understand from

5

the patent that "'molten plastic' . . . simply refers to the wall of the tank being in a melt state as a result of latent heat from the extrusion process, which allows the plastic to flow into a snap-riveting orifice." (D.I. 305 at 3)  The Court agrees with Plastic that a POSA would understand "molten plastic" refers to the state that the plastic tank wall is in after the extrusion process.

Donghee contends that scientific principles require the phrase "molten plastic" to be construed to require that the plastic wall be heated to above a specified temperature. (*See* D.I. 301 at 3-4)  Donghee insists that to practice the claims a semicrystalline polymer must be raised above its melting temperature and an amorphous polymer must be raised above its glass transition temperature. (*Id.*)  While this may be true as a matter of fact,[2] the patents do not say so, and the Court lacks a basis to read this limitation into the claims.  Rather, the patent merely indicates that the tank's wall be sufficiently "pasty" as a result of the latent heat from the moulding process to be able to protrude through the accessory's orifice and form a rivet. ('326 patent at 4:32-35)

Donghee's focus on the language of the specification requiring that the plastic be "truly subjected to fusion" and "plasticized/softened" does not alter the correct construction. (*See* D.I. 301 at 3; D.I. 306 at 1)  Rather, the language supports the Court's opinion that no specified temperature is required.  The patent's one reference to "melting point" and "a melting range spread over at least 10° Celsius" concerns the type of plastic that is suitable for the fuel tank and does not specify that a particular temperature of the plastic is required during rivet-snapping to practice the invention. ('326 patent at 2:49-52)

---

[2]According to Plastic, "there is no dispute that in order to create 'molten plastic,' the plastic must, at some point, be heated until it melts." (D.I. 305 at 1)

6

Donghee also argues that "the PTAB specifically determined that the term 'molten plastic' . . . requires the plastic to be 'above the melting point of the plastic.'" (D.I. 306 at 2) The Court disagrees. The PTAB merely concluded that certain prior art did not teach melting a portion of a tank wall to form molten plastic. (*See* D.I. 294-1 Ex. G at 10) The PTAB was not construing the term in the '326 patent. Nor is the Court persuaded that Plastic's proposal is "broader than the PTAB's construction, and is therefore unreasonable." (D.I. 301 at 1) (emphasis omitted)

## III. CONCLUSION

An appropriate Order follows.

7